25-2621-cr
*United States v. Sow*

# United States Court of Appeals for the Second Circuit

August Term 2026
Argued: October 15, 2026
Decided: November 3, 2026
No. 25-2621-cr

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

ADAMA SOW,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of New York,
No. 23-cr-593, Valerie E. Caproni, *Judge*.

Before: LEVAL, WESLEY, and BIANCO, *Circuit Judges*.

Defendant-Appellant Adama Sow appeals from the district court's judgment, following her guilty plea to one count of trafficking in counterfeit goods, in violation of 18 U.S.C.

§ 2320(a)(1)–(2). The district court sentenced Sow principally to 24 months' imprisonment, to be followed by three years' supervised release, and $111,419.32 in restitution.

On appeal, Sow raises three challenges to her sentence: (1) the district court erred in its consideration of 28 U.S.C. § 994(j), which Sow argues conflicted with the Guidelines and supported a non-custodial sentence; (2) her sentence was procedurally unreasonable because the record did not support either the aggravating role enhancement or the 20-level enhancement for the value of the counterfeit goods under the United States Sentencing Guidelines; and (3) the district court abused its discretion in ordering restitution. We are unpersuaded.

Accordingly, the judgment of the district court is **AFFIRMED**.

HENRY L. ROSS (Olga I. Zverovich, *on the brief*), Assistant United States Attorneys, *for* Jay Clayton, Unites States Attorney for the Southern District of New York, New York., New York.

JUSTINE A. HARRIS (Sophia Villarreal, *on the brief*), Harris Trzaskoma LLP, New York, New York.

---

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Adama Sow appeals from the district court's judgment, following her guilty plea to one count of trafficking in counterfeit goods, in violation of 18 U.S.C. § 2320(a)(1)–(2). The district court sentenced Sow principally to 24 months' imprisonment, to be followed by three years' supervised release, and $111,419.32 in restitution. The conviction arose from Sow's participation, from at least January 2023 and

continuing through October 2023, in the trafficking and distribution of counterfeit luxury goods, including clothing, shoes, and accessories bearing counterfeit marks, through Gotham Mini-Storage ("Gotham"), a storage facility located in Manhattan, New York. In October 2023, law enforcement officers executed search warrants at Gotham and recovered over 80,000 counterfeit items from multiple storage units rented by Sow. Sow was subsequently charged with one count of trafficking counterfeit goods and, on March 21, 2024, pled guilty to that charge without a plea agreement.

In February 2025, the district court held a two-day *Fatico* hearing to resolve a number of factual disputes with respect to the applicable United States Sentencing Commission Guidelines ("Guidelines"). In particular, Sow challenged (1) the government's estimate of the value of the counterfeit items, and (2) the government's allegation that Sow played a supervising role in the criminal activity. At the hearing, the district court heard testimony from Fernando Velazquez ("Fernando") and Thomas Velazquez ("Thomas") (collectively, the "Velazquezes"), two brothers and employees at Gotham, who were paid informants for the government, as well as testimony from Michael Rieger, an employee of Allegiance Protection Group ("APG"), a company that works with luxury brands to protect their intellectual property. Rieger testified as to the appraised value of the counterfeit goods.

Following the hearing, the district court, *inter alia*, applied: (1) a two-level increase for Sow's aggravating role in the offense, pursuant to U.S.S.G. § 3B1.1; and (2) a twenty-level increase for the value of the counterfeit goods, namely, a retail value of more than $9.5 million, but not more than $25 million, pursuant to U.S.S.G. §§ 2B5.3(b)(1)(B) and 2B1.1(b)(1)(K), based on Rieger's analysis. With those rulings, the district court determined that

Sow's total offense level was 27 and that Sow fell within Criminal History Category I, yielding an advisory Guidelines range of 70 to 87 months' imprisonment. The district court then varied downward and imposed a non-Guidelines sentence of 24 months' imprisonment. The district court also subsequently ordered restitution in the amount of $111,419.32, pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663, 3663A, to be paid to the victim brands for the fees incurred in retaining Rieger and his participation in the hearing.

On appeal, Sow raise three challenges to her sentence: (1) the district court erred in its consideration of 28 U.S.C. § 994(j), which Sow argues conflicted with the Guidelines and supported a non-custodial sentence; (2) her sentence was procedurally unreasonable because the record did not support either the aggravating role enhancement or the 20-level enhancement for the value of the counterfeit goods; and (3) the district court abused its discretion in ordering restitution.

For the reasons set forth below, the judgment of the district court is **AFFIRMED**.

## DISCUSSION

We review the procedural reasonableness of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). "This standard incorporates *de novo* review of questions of law, including our interpretation of the Guidelines, and clear error review of questions of fact." *United States v. Vinales*, 78 F.4th 550, 688 (2d Cir. 2018) (internal quotation marks and citation omitted).

In general, we review an MVRA order of restitution deferentially and will reverse only "for abuse of discretion." *United States v. Reifler*, 446 F.3d 65, 120 (2d Cir. 2006); *United States v. Harris*, 302 F.3d 72, 75 (2d Cir. 2002) (per curiam). However, we "review a restitution order's legal conclusions *de novo* and its

findings of fact for clear error." *United States v. Afriyie*, 27 F.4th 161, 166 (2d Cir. 2022) (italics added).

**I. Section 994(j)**

Sow contends that the Guidelines applicable to her offense conflict with Section 994(j), which directs that "[t]he [Sentencing] Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). In particular, Sow argues that "[u]nder the statute, [she] was both a 'first offender' and her offense was not an 'otherwise serious offense,'" and thus, her Guidelines range of 70 to 87 months' imprisonment does not comport with Congress's directive that a non-custodial sentence should be imposed in that situation. Appellant's Br. at 20–21. In short, according to Sow, the district court gave "blind deference to the Guidelines" and failed to properly consider Section 994(j) in imposing a custodial term of imprisonment. *Id.* at 2. We disagree.[1]

As an initial matter, we note that Section 994(j) is directed towards the Sentencing Commission, not the courts. Thus, although a district court can consider the congressional directive in Section 994(j) when deciding what weight to give to a Guidelines provision or range, Section 994(j) does not mandate the imposition of a non-custodial sentence in any particular case. *See* 28 U.S.C. § 994(j) (requiring the Guidelines to "reflect the

[1] The government argues that the plain error standard should apply because Sow failed to raise any objection below to the district court's interpretation of Section 994(j), while Sow counters that *de novo* review should apply. However, we need not resolve this issue because we find no error regarding the district court's consideration of Section 994(j) even under *de novo* review.

*general* appropriateness" of imposing a non-custodial sentence "in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense" (emphasis added)). Instead, in determining a sentence, the district court must consider all the factors set forth in 18 U.S.C. § 3553(a), including the Sentencing Guidelines, in order to reach "an informed and individualized judgment . . . as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)). Thus, "[a] district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* (footnote omitted).

Here, we discern no error in the district court's consideration of the Section 3553(a) factors, including the advisory Guidelines range. Contrary to Sow's contention, the district court did not give "blind deference to the Guidelines." Appellant's Br. at 2. Rather, after calculating the Guidelines range, the district court explained that "the [G]uideline sentence is substantially longer than necessary to achieve the goals of sentencing" and imposed a significant downward variation. App'x at 700. The district court specifically noted that the Guidelines range was "draconian" and that neither "side has proposed a sentence in this case that is reasonable and accomplishes the goals of sentencing." *Id.* Moreover, in explaining why a two-year prison sentence was warranted, the district court emphasized that selling counterfeit goods "is a serious offense," *id.* at 695, and that it did not "think a sentence of no jail [was] reasonable in this case, given the fact that this was an ongoing business that went on for years," putting Sow "in a very different position than just your random counterfeiter," *id.* at 700. Thus, the record clearly demonstrates

"independent review of the sentencing factors" by the district court, including the Guidelines. *Cavera*, 550 F.3d at 189.

We similarly conclude that the district did not err in its consideration of Section 994(j) in arriving at a custodial sentence. The district court determined Section 994(j) was inapplicable to this case "because [] Sow received a leadership enhancement pursuant U.S.S.G. § 3B1.1(c)," and thus, "she is not a typical first-time offender." App'x at 720. The district court added that, "U.S.S.G. § 4C1.1, which the Sentencing [Commission] adopted in response to 28 U.S.C. § 994(j), specifically bars individuals who receive § 3B1.1 aggravating role enhancements from receiving Guidelines reductions that would otherwise be available to them as first-time offenders." *Id.* Although Sow suggests that the district court failed to recognize that it had the discretion to disregard Section 4C1.1 in interpreting who is a "first offender" under Section 994(j), we are unpersuaded. There is nothing in the record to suggest that the district court misunderstood its authority and, indeed, it varied downward from the Guidelines range after considering various Section 3553(a) factors. *See United States v. Fernandez*, 443 F.3d 19, 30 (2d Cir. 2006) (emphasizing the presumption "that the district court knew and applied the law correctly" (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005))), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007). Accordingly, the district court did not err in its consideration of Section 994(j) when imposing a custodial sentence of two years' imprisonment.

### II. Aggravating Role Enhancement

With respect to the aggravating role enhancement under Section 3B1.1(c), Sow asserts that the record was "[i]nsufficient" because it (1) "relied on incredible and uncorroborated hearsay in violation of [her] due process rights," Appellant's Br. at 30–31,

and (2) "lacked the specificity required to warrant an enhancement," *id.* at 34. We disagree.

The two-level "aggravating role" enhancement is warranted where the defendant "was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). A defendant is considered a manager or supervisor "if [s]he exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Hertular*, 562 F.3d 433, 448 (2d Cir. 2009) (internal quotation marks and citation omitted). It is sufficient that the defendant only manages or supervises one other participant in the criminal activity for the enhancement to apply. *See United States v. Garcia*, 413 F.3d 201, 223 (2d Cir. 2005) (holding that the recruitment of one drug courier into the conspiracy could "by itself" support the enhancement).

Here, the district court did not clearly err in determining, after a *Fatico* hearing, that the aggravating role enhancement was warranted. More specifically, the district court found that "Fernando and Thomas Velazquez were generally credible in their testimony," including the testimony establishing that "Sow was the single-largest vendor in the [Gotham] facility and that she had people working for her." App'x at 663–64. The district court further "credit[ed] the testimony that the Lebanese or Albanian guy worked for her from about 2017 to about 2023 when the raid [at Gotham] occurred." *Id.* at 664. In particular, both Velazquezes testified that Sow had at least one person whom they observed consistently working with her and under her direction. For example, Thomas stated that Sow "always had assistants," and that one in particular was "always pretty much . . . under her wing." *Id.* at 67. Thomas would "go to [the assistant] if [Sow] had any requests." *Id.* He further testified that the assistant took

instructions from Sow and the assistant told him that he was paid for his work. *Id.* When there was an altercation at the facility involving the assistant, Thomas spoke with Sow about the assistant's behavior. *Id.* at 68. Likewise, Fernando testified that Sow had an assistant who "would take all her boxes upstairs to her units, bring them downstairs for other customers, and she would say he was her employee." *Id.* at 149. Fernando explained that he saw the assistant "a couple times a day," "[e]very day," and that he believed the assistant worked seven days a week. *Id.* In sum, the testimony by the Velazquezes, which the district court was entitled to credit, was more than sufficient to support the imposition of the aggravating role enhancement under Section 3B1.1(c). *See United States v. Norman*, 776 F.3d 67, 78 (2d Cir. 2015) (emphasizing that "the judge who presided over the trial or over an evidentiary sentencing hearing is in the best position to assess the credibility of the witnesses, and her decisions as to what testimony to credit are entitled to substantial deference").

In reaching this determination, we have considered Sow's arguments and find them unpersuasive. For example, Sow argues that the Velazquezes' testimony "relied on incredible and uncorroborated hearsay." Appellant's Br. at 31–32. However, "[a] sentencing court is free to consider hearsay evidence . . . in determining sentence," *United States v. Gomez*, 580 F.3d 94, 105 (2d Cir. 2009) (quoting *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir. 1996)), subject to the requirement under the Due Process Clause that "some minimal indicia of reliability accompany a hearsay statement," *United States v. Martinez*, 413 F.3d 239, 244 (2d Cir. 2005) (internal quotation marks and citation omitted). Here, as noted above, much of the testimony regarding the assistant's role was based upon first-hand observations by the Velazquezes, as well as Sow's own admission to Fernando that she paid the assistant for his work. Therefore, more than minimal indicia of

reliability accompanied any hearsay that was elicited at the hearing.

Sow also points to some discrepancies in the Velazquezes' testimony. However, the district court explained why, notwithstanding any of the purported discrepancies, it still found the Velazquezes' testimony sufficiently credible and reliable. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (explaining that even where the factfinder may determine that portions of a witness's testimony are "inaccurate, contradictory and even untruthful in some respects," it may still find the witness "entirely credible in the essentials of his testimony") (internal quotation marks and citation omitted). As the Supreme Court has emphasized, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985), and we find no basis here to disturb the district court's factual findings and credibility determinations that supported the aggravating role enhancement under Section 3B1.1(c).

## III. Value of Counterfeit Goods

Sow argues that the district court "clearly erred in finding: (1) that [she] was responsible for 85,000 goods seized from Gotham storage units in October 2023; (2) that [she] was responsible for trafficking at least $3.1 million in goods between May 2021 and October 2024; and (3) that the value assigned to the seized goods was the mid-point of Mr. Rieger's estimates." Appellant's Br. at 37. We find each of these arguments unpersuasive.

"To sustain quantity-based enhancements for relevant conduct, the court must base its findings on specific evidence that the offense involved the requisite quantity of items. This evidence can, however, be circumstantial." *United States v.*

*Archer*, 671 F.3d 149, 162 (2d Cir. 2011) (internal quotation marks and citation omitted). "This requirement has two parts: (a) there must be evidence regarding the quantity of illicit or fraudulent goods and (b) it has to be specific to the defendant." *Id.*

First, with respect to the 85,000 counterfeit items in the 16 storage units at Gotham, Sow argues that "the brothers' testimony is an insufficient basis upon which to premise the Court's factual findings," particularly because the storage facility's documentation could have been modified. Appellant's Br. at 38. We disagree. The district court explained that it "agree[d] with the defense that the records of the facility were messy and that their procedures were not very tight," but that it "credit[ed] the testimony of [Fernando]" that the units at issue contained goods that belonged to Sow. App'x at 663–65. In particular, Fernando testified that there were no discrepancies between the system's documentation and the units that Sow was renting, and that he had personally seen Sow in the units at issue. *Id.* at 165. Fernando further testified that he did not falsify any records. *Id.* at 169–70. We see no basis to disturb the district court's credibility determination. *See Norman*, 776 F.3d at 78.

Second, the district court did not clearly err in determining the value of the goods seized from the 16 units. In doing so, it credited Rieger's evaluation of the street value of the items, explaining that "Rieger ha[d] the right background and expertise to value those counterfeits." App'x at 665. Under Rieger's assessment, assuming multiple sales throughout a day, he attributed a midpoint sales value to the average quality counterfeits, divided into various product categories. Using those midpoints, multiplied by the relevant number of items, Rieger estimated the street value of the seized items to be $7,486,562.50. The district court then discounted that estimate by 10 percent to "take into account the fact that the market for these

goods was Canal Street or similar venues, not stores or other venues where the prices might be a little higher." *Id.* at 665. There was no clear error in that methodology, which provides a "reasonable estimate" of the value of the seized items that takes into account the "fair market value" of the property." U.S.S.G. § 2B1.1, cmt. n.3(B)(i). The estimate was specifically linked to the number of goods recovered during the seizure, which the district court already determined were credibly tied to Sow. Therefore, the district court's determination is both sufficiently specific to the defendant and tied to clear evidence regarding the quantity of infringed goods. *See Archer*, 671 F.3d at 162.

Finally, using Sow's bank records for eight months of 2021, which showed "$3.1 million moving through her TD Bank accounts . . . , when business in New York was restarting after the pandemic," and "[e]xtrapolating that into 2022 and giving the defendant the benefit of the doubt, that 2022 and 2023 were each about the same as 2021," the district court reasonably estimated the amount of counterfeit goods trafficked before the seizure. App'x at 666. Based on the financial records, it determined that "more than $9 million ran through her accounts from May 2021 through the date of the seizure." *Id.* The district court further explained that, even if it did not extrapolate the amount to the successive years, adding the $3.1 million to Rieger's (discounted) $6.6 million market value estimate would yield a value of approximately $9.7 million seized goods, at the lower end of the government's proposed estimate. *Id.* The district court's determination is consistent with the Guidelines, which explain that "[i]n a case in which the court cannot determine the number of infringing items, the court need only make a reasonable estimate of the infringement amount using any relevant information, including *financial records*." *See* U.S.S.G. § 2B5.3, cmt. n.2(E) (emphasis added).

In sum, the district court did not clearly err in determining the value of the counterfeit goods based upon the evidence adduced at the *Fatico* hearing, and applying a twenty-level increase under the Guidelines, pursuant to Sections 2B5.3(b)(1)(B) and 2B1.1(b)(1)(K), based on that determination.

**IV. Restitution Award**

Finally, Sow challenges the award of restitution to various luxury brands, pursuant to the MVRA, in the amount of $111,419.32 for the expenses they incurred retaining APG over the course of the investigation and prosecution. *See generally United States v. Sow*, 23-CR-593 (VEC), 2025 WL 2802547 (S.D.N.Y. Oct. 2, 2025).

In particular, Sow argues that the district court erred in ordering restitution to the affected brands because "there is no proof that the brands suffered any 'pecuniary loss'" and "therefore [they] cannot recover restitution" for the fees charged by APG in providing consultation on the street value of the counterfeit goods. Appellant's Br. at 44. We disagree.

The MVRA requires courts to order restitution when (1) the defendant has been sentenced for an enumerated crime (which includes the crime against property at issue here), 18 U.S.C. § 3663A(c)(1)(ii), and (2) "an identifiable victim or victims has suffered a physical injury or pecuniary loss" as a result of that crime, *id.* § 3663A(c)(l)(B). "In ordering restitution under the MVRA, a court must consider two distinct questions: (1) does the MVRA apply in the case at hand; and, if so, (2) what is compensable as restitution?" *United States v. Avenatti*, 81 F.4th 171, 207 (2d Cir. 2023).

At sentencing, the district court found that "counterfeit sales harm the brand." App'x at 696. More specifically, the district court explained that "[b]oth by making products that appear to

be the brand ubiquitous—everybody has them—they undermine the exclusive nature that the brand is going for, and because some people may associate shoddy products with the brand, it tends to harm the brand." *Id.* The government subsequently sought $111,419.32 to compensate the brands for the retention of Rieger and the cost of his evaluation of the goods and participation in the *Fatico* hearing. In granting that request under the MVRA, the district court found, *inter alia*, that: (1) "counterfeit trafficking at Gotham, including by Ms. Sow, caused the Government's investigation and the Government's investigation, in turn, resulted in harm to the brands by way of fees it paid APG," *Sow*, 2025 WL 2802547, at *4; (2) "the unrefuted testimony from the *Fatico* hearing reveal[ed] that the Government specifically asked APG to perform the authentication and appraisal tasks for which it now seeks restitution," *id.*; and (3) the expenses for which restitution was sought were necessary because those expenses "relate[] exclusively to APG's expert analysis of [the number and value of the counterfeit goods attributable to Sow] and its participation in the *Fatico* hearing that Ms. Sow herself requested," *id.* at *5. We find no error with respect to those determinations.

Sow first posits that the "government failed to establish, or offer any proof, that the brands suffered any pecuniary loss" "apart from APG's fees"—*i.e.*, that the court erred in its factual finding—and second, that the district court erred legally because "unquantifiable damage to an intangible property interest, such as a trademark, is not the kind of quantifiable, monetary harm encompassed in the definition of pecuniary loss." Appellant's Br. at 45–46 (internal quotation marks and citation omitted). Both arguments fail. The district court's determination was amply supported by the record. Among other things, Sow admitted that use of the counterfeit marks was "likely to cause confusion, to

cause mistake, or to deceive," App'x at 25, 34, and the district court found that Sow was responsible for over 80,000 counterfeit items and millions of dollars of trafficked goods, *see* App'x at 639–42.

We likewise find no legal error in awarding restitution for harm to intangible rights. We have explained that the MVRA does not preclude holders of intangible rights from being considered "victims" under the statute—indeed, "[o]ur precedents dictate that the definition of property is broader" than just "tangible property." *United States v. Bengis*, 631 F.3d 33, 40 & n.3 (2d Cir. 2011). Moreover, we have emphasized that that "[i]t is well settled that trademarks are a form of property, and that intellectual or intangible property falls within the purview of criminal statutes designed to protect property." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007) (internal citation omitted). As such, the district court did not err in determining that the intangible harm caused to the brands was properly considered pecuniary loss under the MVRA. That loss can include expenses, such as legal fees, incurred in the investigation of the harm caused by the infringing conduct. *See Afriye*, 27 F.4th at 164–65 (affirming restitution order for legal fees stemming from the government's criminal investigation and prosecution of the offense conduct involving insider trading); *see also United States v. Diakhoumpa*, 718 F. App'x 37, 41–42 (2d Cir. 2017) (summary order) (affirming restitution order reflecting victim brands' "costs of investigating Defendant's sales of counterfeit products"). Finally, there was sufficient evidence to support the finding that the costs of APG's investigation reflected "pecuniary loss" that was "a direct and proximate result" of Sow's criminal activity. *Avenatti*, 81 F.4th at 208. As the district court explained, Sow was the "facility's most prolific counterfeiter" and therefore "undoubtedly contributed" to the determination by law

enforcement that there was probable cause to search the facility. *Sow*, 2025 WL 2802547, at *3. Thus, "[i]t strains credulity . . . to suggest that the Government's investigation of counterfeiting at Gotham would have proceeded in the manner it did were it not for Ms. Sow's conduct." *Id.* Moreover, it was foreseeable to Sow that her conduct would lead to an investigation of the facility and the counterfeit goods. *See United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021) (explaining that "[t]he basic question" that the causation requirement under the MVRA "presents is whether the harm alleged has a sufficiently close connection to the conduct, which we evaluate based on whether that harm was foreseeable to a defendant" (internal quotation marks and citation omitted)).

In sum, there is no basis to disturb the restitution award to the brands.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.